| | |
|---|---|
| ATLAS AIR, INC. and SOUTHERN AIR, INC., | Civil Action No. 7:17-cv-00903-NSR |
| Plaintiffs, | |
| v. | |
| INTERNATIONAL BROTHERHOOD OF TEAMSTERS; INTERNATIONAL BROTHERHOOD OF TEAMSTERS, AIRLINE DIVISION; and AIRLINE PROFESSIONALS ASSOCIATION OF THE INTERNATIONAL BROTHERHOOD OF TEAMSTERS, LOCAL UNION NO. 1224, | |
| Defendants. | |

## DECLARATION OF ROBERT KIRCHNER

I, Robert Kirchner, do hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 the following:

1.     I am employed as a pilot by Atlas Air, Inc. ("Atlas").  I am type-rated by the Federal Aviation Administration to fly numerous aircraft, including the Boeing B-747.  I previously worked for Polar Air Cargo, Inc. ("Polar"), also as a B-747 captain.  I was first employed by Polar on January 17, 2000.  When Atlas and Polar became parties to a single collective bargaining agreement in September 2011, all of the Polar pilots became employees of Atlas and, since that time, I have worked for both Atlas and Polar under a single seniority list.

2.     I was formerly a member of the Air Line Pilots Association ("ALPA"), a labor organization that separately represented the Atlas and Polar pilots.  When the International Brotherhood of Teamsters, Airline Division ("IBTAD") replaced ALPA as the Atlas and Polar

1

pilots' labor representative in December 2008, I was appointed by the IBTAD and the executive board of the IBTAD'S affiliate, Airline Professionals Association of the International Brotherhood of Teamsters, Local Union No. 1224 ("Local 1224"), to serve as a member and Chairman of the Polar Pilots Transition Executive Committee ("Polar TEC") to represent the interests of the Polar pilots. (The Atlas pilots also had a transition executive committee to represent their interests, called the Atlas Pilots Transition Executive Committee ("Atlas TEC").) In my capacity as Chairman of the Polar TEC, and on behalf of the IBTAD and Local 1224, I directed and personally carried out the daily representative responsibilities for the benefit of the Polar pilots. Among many other functions, I participated in the 2009-2011 negotiations and interest arbitration that resulted in the current single collective bargaining agreement ("SCBA") covering the Atlas and Polar pilots, all of whom, as noted above, now work under that contract pursuant to a single, integrated seniority list. Effective January 1, 2015, I was elected Chairman of the Atlas Pilots Executive Council, the 5-person board that, upon the imposition of the SCBA and on behalf of the IBTAD and Local 1224, assumed the daily representative responsibilities that had been performed by the Polar TEC and Atlas TEC. As Chairman of the Atlas Pilots Executive Council, I am also a member Local 1224's governing Executive Board. In my capacity as Chairman of the Atlas Pilots Executive Council, I have participated in the collective bargaining negotiations between the IBTAD and Local 1224 (collectively, the "Union") and Atlas/Polar to amend the SCBA that commenced in December 2015. Based on my representative activities for the benefit of Union-represented pilots working under the Atlas/Polar SCBA, my review of various documents obtained in the ordinary course of business relating to those representative activities, and my review of documents maintained in the ordinary course of Local 1224's business of representing its members who are employed by various other airlines,

including Southern Air, Inc. ("Southern"), I have personal knowledge of the facts set forth below and if called as a witness in this matter, I could and would competently testify thereto.

<u>**Plaintiff Atlas's Corporate Background and Labor Relations with Its Pilots**</u>

3.       Founded in 1993, Atlas developed its "ACMI leasing" line of business in which Atlas provided aircraft, crews, maintenance and insurance as an integrated package to third-party airlines on a contract basis for a specified period of time.

4.       In 2000, Atlas formed a holding company parent named Atlas Air Worldwide Holdings, Inc. ("AAWW"). Upon completion of that transaction, Atlas became a wholly-owned subsidiary of AAWW.

5.       In November 2001, AAWW acquired 100% of the stock of Polar. Upon completion of the transaction, Polar then joined its new sister company, Atlas, as a wholly-owned AAWW subsidiary airline. Atlas and Polar continued to operate under separate certificates issued by the United States Department of Transportation ("DOT"). As such, Atlas continued to lease and operate full freighter aircraft for the benefit of other airlines, the United States military, large integrators, and freight consolidators, while Polar continued to provide scheduled air freight transportation to and from the United States.

6.       On January 30, 2004, AAWW and its subsidiaries, including Atlas and Polar, filed for Bankruptcy Chapter 11 protection. They emerged from bankruptcy under a plan of reorganization filed on April 19, 2004, that became effective on July 27, 2004. As part of their post-bankruptcy restructuring, Atlas and Polar jointly operated and shared various back-office administrative functions, including human resources, accounting, finance and legal, but continued to maintain separate operations and separate DOT operating certificates.

7.       In 2005, DHL Network Operations, Inc. ("DHL") expressed considerable interest

in acquiring Polar.  DHL approached AAWW to discuss the potential sale of all or a portion of

Polar's business (primarily the Asia-focused portion) to DHL.  AAWW and DHL discussed a

complex, multi-step transaction that would enable DHL, a foreign enterprise, to acquire and

control a United States DOT-certificated air carrier.

8.  The AAWW-DHL transaction required the transfer of Polar's air freight

operations and employees from one AAWW subsidiary (Polar) to another AAWW subsidiary,

Airline Acquisition Corp I.  Airline Acquisition Corp I then changed its name to Polar Air Cargo

Worldwide, Inc. ("PACW").  In or about June 2007, the necessary conditions for completion of

the AAWW-DHL transaction were satisfied. At that time, PACW commenced air freight

operations using the "Polar Air Cargo" brand.

9.  The above-described transactions had a significant impact on the Atlas and Polar

pilots and their former labor representative.  Atlas's and Polar's pilots were at that time

separately represented by ALPA, a labor organization wholly separate from the IBTAD and its

affiliated locals.  The National Mediation Board ("NMB") had certified ALPA as the exclusive

collective bargaining representative of the Polar pilots in 1996 and the Atlas pilots in 1999.

Both groups of pilots negotiated separately with their respective companies, and each group was

still working under the terms of its first and only collective bargaining agreement.

10.  In June 2005, AAWW advised the DOT that it had decided to merge Atlas

operationally into Polar, using Polar's DOT air certificate while, for commercial purposes,

continuing to maintain separate Atlas and Polar brands.  (A true and correct copy of that notice to

the DOT, styled, "*Joint Application of Atlas Air Worldwide Holdings, Inc., Atlas Air, Inc., and*

*Polar Air Cargo, Inc. for Registration of Additional Trade Name and Re-Issuance of Polar*

*Certificates of Public Convenience and Necessity and Exemption Authority, DOT Docket OST-*

*2005 (June 6, 2005)*," is attached hereto as Exhibit A.)  AAWW further advised that "Atlas and Polar have begun the multi-step FAA process necessary to accomplish this objective and expect completion in January 2006."  (*Id. at 4.*)  AAWW also advised the NMB of its decision to merge the operations and certificates of Atlas and Polar in June 2005.

11.     When AAWW announced its intent to merge Atlas and Polar, the Atlas pilots supported that decision but the Polar pilots did not.  In the fall of 2005, after collective bargaining negotiations and NMB-supervised mediation failed, the ALPA-represented Polar pilots commenced a strike against Polar.  The pilots subsequently returned to work pursuant to an agreement that extended the terms of pilots' then-existing collective bargaining agreement.  Also as a result of that strike, ALPA and the Polar pilots were required to take steps pursuant to ALPA's merger procedures to effectuate Polar's operational merger with Atlas.  In or about March 2006, the Atlas and Polar pilots began the process of integrating their respective seniority lists pursuant to ALPA's merger procedures.  After failing to reach agreement among themselves, the two pilot groups submitted their dispute to an arbitrator who, on November 24, 2006, issued an award integrating the two pilot groups' separate seniority lists.

12.     In the meantime, AAWW decided not to go forward with its previously announced operational merger of Atlas and Polar.  Instead, as set forth in a May 24, 2006 letter to the DOT, AAWW's "desired synergies will be obtained by FAA-approved means other than a full operational merger of the two airlines."  (A true and correct copy of the May 24, 2006 letter is attached hereto as Exhibit B.)   Atlas and Polar nevertheless continued to seek a single collective bargaining agreement ("SCBA") covering the Atlas and Polar pilot groups working under an integrated seniority list and to effect as much of an operational merger of the two carriers as permitted by the DOT.  ALPA resisted this effort, and Atlas and Polar filed

5

management grievances pursuant to their respective labor agreements to compel the ALPA pilots and ALPA to negotiate for a SCBA. The grievances also demanded expedited arbitration. On behalf of the Atlas pilots, ALPA agreed that it was contractually obligated to bargain. On behalf of the Polar pilots, however, ALPA rejected AAWW's grievance and refused to negotiate for an SCBA. Thereafter, in August 2007, Polar filed an action in this Court against ALPA and its Polar pilots' Master Executive Council seeking to compel them to arbitrate the management grievance on an expedited basis. (*See Polar Air Cargo Worldwide, Inc. v. Air Line Pilots Association et al., Case No. 1:07-cv-7327 (S.D.N.Y.).*) In September 2007, this Court issued an order requiring the parties to arbitrate whether Polar's management grievance was required to be arbitrated on an expedited basis, and to determine when that grievance would be scheduled for a hearing on the merits. (A true and correct copy of the Order Compelling Arbitration in that case is attached hereto as Exhibit C.)

13. The hearing on Polar's grievance began in March 2008. On May 9, 2008, the ALPA Executive Council adopted a resolution directing ALPA's president to present the combined Atlas and Polar seniority list to management and to begin negotiations for a single CBA. ALPA presented the integrated seniority lists to AAWW on May 23, 2008. Pursuant to both the Atlas and Polar labor contracts, ALPA's presentation of the combined seniority list triggered a nine-month clock for direct negotiations, after which all open issues were subject to resolution by final and binding interest arbitration. As a result, the Polar management grievance was withdrawn on June 10, 2008.

14. On September 29, 2008, the NMB determined that Atlas and Polar constituted a "single transportation system for representation purposes," a status commonly referred to as a "single carrier." Their status as a single carrier for labor representation purposes, however, did

not negate the fact that both Atlas and Polar continued to exist and maintain separate airline operations.  In fact, Atlas and Polar were required by the FAA to maintain separate airline operations.  In an FAA-approved, 20-year agreement between Atlas and Polar dated June 28, 2007, Atlas agreed to provide certain specified flight and flight-related services to Polar.  (A true and correct copy of that June 28, 2007, Flight Services Agreement is attached hereto as Exhibit D.)  As set forth therein, upon the eventual completion of a SCBA covering both the Atlas and Polar pilots, all of the pilots would become Atlas employees and Atlas would in turn provide Polar with various flight services, including flight crew, maintenance and insurance services.  Thus, as set forth in section 1.3 of the agreement, Atlas and Polar agreed that:

> ATLAS shall provide specified services to support COMPANY's [Polar's] operations as a stand-alone U.S.-certificated airline holding out scheduled air cargo services to the general shipping public.

(*Id. Section 1.3.*)  The agreement also provides that:

> At all times when this Agreement is in effect, COMPANY [Polar] shall have the authority and responsibility to supervise, direct and control Flight Crewmembers [pilots], including Assigned Crewmembers, during the performance of Flight Duties and on Duty Assignment at or away from Base.

(*Id. Section 2.3.*)  Furthermore, Section 6.4 of the agreement provides that:

> Notwithstanding anything else in this agreement to the contrary, COMPANY [Polar] shall provide or otherwise assume responsibility for all of the following:
> …
> Flight operational control…

(*Id. at Section 6.4(a)(iii).*)  Finally, the agreement provides that:

> During the Term of this Agreement, the [Polar] Aircraft shall be registered under the laws of the United States of America.  Notwithstanding any other provision of this Agreement (including those set forth in the attached Annexes), the Aircraft shall at all times be under the exclusive possession, direction and operational control of the COMPANY [Polar].

(*Id. Section 7.1; see also id. Section 1.1.*)  Subsequently, in 2011, Atlas and Polar entered into a "Crew Services Agreement" to remain in effect "so long as the Flight Services Agreement

between Atlas Air, Inc. and Polar Air Cargo Worldwide, Inc., dated June 28, 2007 (the "FSA") is in effect." (A true and correct copy of the Crew Services Agreement is attached hereto as Exhibit E.) As set forth in the Crew Services Agreement, Atlas and Polar agreed that:

> At all times during the performance of Flight Duties on POLAR flights and on Duty Assignments for POLAR, Assigned Flight Crewmembers and Assigned Check Airmen shall be deemed agents of POLAR. At all times, POLAR shall be in operational control of POLAR's flights and POLAR shall have the authority and responsibility to supervise, direct, and control Assigned Flight Crewmembers and Assigned Check Airmen at all times during the performance of Flight Duties on POLAR flights and on Duty Assignment for POLAR flights.

(*Id. Section 1.7.*) The Crew Services Agreement also provides that:

> Notwithstanding any other provision of this Agreement, POLAR Aircraft shall at all times be under the exclusive possession, direction, and operational control of POLAR.

(*Id. Section 5.2.*)

15. On December 22, 2008, the IBTAD replaced ALPA as the NMB-certified exclusive collective bargaining representative of the Atlas and Polar pilots. Despite the change in labor representatives, the terms of the Atlas and Polar collective bargaining agreements remained in place, though ALPA's internal policies and procedures, including its merger procedures, did not.

16. In February 2009, the Union, Atlas and Polar entered into a letter of agreement styled "Negotiation Framework for Merged Collective Bargaining Agreement" (the "Framework Agreement"). (A true and correct copy of the 2009 Framework Agreement is attached hereto as Exhibit F.) The 2009 Framework Agreement laid out the ground rules by which the parties would negotiate a SCBA covering both the Atlas and Polar pilots, all of whom would work under a single seniority list while working for two separately certificated air carriers. While it contained certain terms similar to the contractual provisions set forth in the then-existing Atlas and Polar contracts, the Framework Agreement was not part of either of those agreements. In

this regard, it expressly provided that:

> To the extent a specific provision in this LOA is in conflict with a specific provision contained in the applicable collective bargaining agreements, letters of agreement or other understandings entered into by ALPA when it was exclusive bargaining agent of the Crewmembers, this LOA shall be controlling, *provided*, the parties agree that nothing contained in this LOA diminishes the obligations set forth in Section 1 of the applicable collective bargaining agreements.

(*Ex. F, Section G.4.*)

17.     The parties then engaged in direct negotiations pursuant to the Framework Agreement for approximately two years, but were unable to reach agreement on all contract terms.  As a result, they submitted their outstanding issues to interest arbitration in late 2010, in accordance with the Framework Agreement.

18.     Throughout the direct negotiations and interest arbitration proceeding, the Union sought to bind AAWW to contractual terms and conditions relating to the scope of covered work, job security and labor protections in the event of certain corporate transactions (*i.e.*, so-called "scope terms").  In so doing, the Union recognized that corporate transactions such as mergers, acquisitions, and spin-offs, all of which directly and significantly affect the pilots' job protections, almost always are structured and effectuated at the corporate parent level.  Thus, any scope terms in an SCBA covering only Atlas and Polar, and binding only Atlas and Polar, were essentially meaningless.  AAWW, Atlas, and Polar clearly recognized this fact too, and vigorously resisted the Union's efforts to bind AAWW to the contractual scope provisions.  At the arbitration, and in their brief, Atlas and Polar argued that AAWW was not subject to the jurisdiction of the arbitration and therefore could not be bound to the merged collective bargaining agreement.   (Relevant excerpts from Atlas/Polar's post-hearing interest arbitration brief are attached hereto as Exhibit G.  Relevant excerpts from the interest arbitration hearing

transcript (pages 48-58) are attached hereto as Exhibit H.) Relying on the Supreme Court's decision in *AT&T Technology v. Communications Workers of America*, 475 U.S. 642 (1986), Atlas and Polar argued that the arbitrator's jurisdiction was derived from the then-existing Atlas and Polar collective bargaining agreements and the 2009 Framework Agreement, to which AAWW was not a party. In early September 2011, the arbitrator issued his award imposing terms for an SCBA. (A true and correct copy of the arbitrator's decision and award is attached as Exhibit 30 to the Declaration of Jeffrey D. Carlson dated April 20, 2017 ("April 20, 2017 Carlson Decl..").) In his award, the arbitrator rejected the Union's proposal to bind AAWW to the SCBA's scope provisions. As a result, AAWW is not a party to the current Atlas/Polar SCBA covering the Union-represented pilots. The SCBA imposed by the arbitrator could be opened for negotiation any time after September 8, 2015, and became formally "amendable" under the Railway Labor Act ("RLA"), 45 U.S.C. § 181, on December 31, 2016. Because the arbitrator imposed the terms of the merged contract upon the parties, the Atlas and Polar pilots never had the opportunity to vote upon the terms of their contract, under which they have been working for more than five years.

19.    The current labor agreement between the IBTAD and Atlas/Polar covers the crewmembers (pilots) in the employ of the "Company." Section 1.A. of the agreement defines the "Company" as "Atlas Air, Inc. and Polar Air Cargo Worldwide, Inc. (a single Air Carrier collectively referred to as the 'Company')." Section 1.F. of the agreement contains work preservation provisions, also known as "labor protections" and "scope." (A true and correct copy of Section 1 of the 2011 labor agreement between the IBTAD and Atlas/Polar is attached as Exhibit 4 to the April 20, 2017 Carlson Declaration.) These provisions are triggered "in the event" of certain specified transactions, namely:

10

(1)     In the event the Company is acquired and thereafter the acquirer decides there will be a complete operational merger between (i) the Company and the acquirer, or the Company and another air carrier under the control of the acquirer, or (ii) if the acquirer notifies the Union of its intent to integrate the Crewmember seniority lists of the Company and the acquirer, or the Company and another air carrier under the control of the acquirer[; and]

(2)     In the event (i) the Company acquires another air carrier and Company decides there will be a complete operational merger between the Company and such other air carrier, or if the Company notifies the Union of its intent to integrate the Crewmember seniority lists of the respective carriers, or (ii) in the event the Company decides there will be a complete operational merger between the Company and an affiliated air carrier, or if the Company notifies the Union of its intent to integrate the Crewmember seniority lists of the Company and an affiliated air carrier …

(*April 20, 2017 Carlson Decl. Ex. 4, Section F.1-2.*)  In the event either of the above two transactions occurs, then two additional trigger provisions apply. The first trigger pertains to the integration of the Company's pilot seniority list with that of the other carrier involved in the Section 1.F. covered transaction.  The second trigger pertains to the status of the collective bargaining agreements in effect at the time the Section 1.F.-covered transaction took place.  This second trigger accounts for various contingencies that depend upon the identity of the labor representative(s) of the affected carriers' pilots.  One scenario, for example, involves situations where the pilots of the Company and the acquired carrier are both represented by the Union.  In such a scenario, the agreement provides:

> If the crewmembers of the acquired carrier are represented by the Union, then the parties shall on a timely basis begin negotiations to merge the two pre-integration collective bargaining agreements into one agreement.  If a merged agreement has not been executed within nine (9) months from the date that the Union presents to the Company a merged seniority list that complies with the provisions of this paragraph F.2, the parties shall jointly submit the outstanding issues to binding interest arbitration, [sic]  The interest arbitration shall commence within thirty (30) days from the conclusion of negotiations contemplated by this paragraph, and a final decision shall be issued within sixty (60) days after the commencement of the arbitration.

(*Id. Section F.2.b.iii.*)  In the absence of a Section 1.F.-covered transaction, the Section 1.F.-

trigger provisions relating to the integration of pilot seniority lists and merger of pre-integration collective bargaining agreements do not apply.

## The 2016 AAWW-SAHI Acquisition

20.     On January 19, 2016, AAWW signed a definitive agreement to acquire Southern Air Holdings, Inc. ("SAHI") and its two airline subsidiaries, Southern and Florida West.  Upon shareholder approval, the acquisition was completed on or about April 7, 2016, at which time both Southern and Florida West became second-tier subsidiaries of AAWW.  Upon completion of the transaction, AAWW thus became the corporate parent of the four air carriers -- namely, Atlas, Polar, Southern and Florida West, each of which maintained separate airline operations.

21.     Shortly after announcing its intent to acquire SAHI and its subsidiary carriers, AAWW also announced its intent to merge the operations of Atlas and Southern.   In this regard, on January 26, 2016, Atlas, Polar, Southern and Florida West advised the DOT that AAWW intended to acquire SAHI and its subsidiary air carriers. They also requested agency approval of the transfer of all regulatory certificates and other economic authorities held by Southern and Florida West upon the completion of AAWW's acquisition of SAHI and its subsidiary air carriers.  (A true and correct copy of that request to the DOT, styled *"Joint Application of Atlas Air, Inc., Polar Air Cargo Worldwide, Inc., Southern Air, Inc., and Florida West International Airways, Inc. for Approval of a De Facto Transfer of Route Authorities, Docket DOT-OST-2016_____,"* is attached hereto as Exhibit I.)  Simultaneously, in a separate filing, Atlas, Polar, Southern and Florida West requested that the DOT grant interim relief from agency regulations pending final agency approval of their transfer requests so that they could operate as separate but commonly owned subsidiary air carriers under the AAWW corporate umbrella upon corporate shareholder approval of the acquisition.  (A true and correct copy of that request, styled *"Joint*

*Application of Atlas Air, Inc., Polar Air Cargo Worldwide, Inc., Southern Air, Inc., and Florida West International Airways, Inc. for an Exemption, Docket DOT-OST-2016-_____,"* is attached hereto as Exhibit J.) In that submission, they advised the DOT that, following the completion of the acquisition, AAWW would own all of the carriers, but they would "continue to operate separately pending the Department's final decision" on their request "and for some period of time thereafter." (*Id. Section 6.*) The DOT granted their request for an exemption *pendente lite* in an order served on March 14, 2016. The DOT's exemption was granted on March 14, 2016. (A true and correct copy of the DOT's March 14, 2016, *Order Granting Exemption* is attached hereto as Exhibit K.) The DOT's exemption was, and still is, "contingent upon the air carriers involved, in this case Atlas, Polar, Southern, and [Florida West], remaining separate and independently operated entities until the [DOT] rules on the underlying *de facto* transfer request." (*Id. at 3.*) In granting the exemption, DOT reasoned that, "[a]s long as Atlas, Polar, Southern, and [Florida West] remain separate entities, should we disapprove the proposed transfer either in whole or in part, AAWW could divest itself of [SAHI]." (*Id.*) To date, the DOT has not yet approved the applicants' underlying transfer request.

### 2016 Atlas/Polar Negotiations for an Amended Stand-Alone Contract

22.     Before AAWW announced its intention to acquire SAHI and its subsidiary airline in January 2016, the IBTAD-Atlas/Polar SCBA had already been opened for renegotiation.

23.     After meeting in December 2015 and early January 2016 to discuss various protocols to govern their negotiations, the IBTAD and Atlas/Polar commenced formal negotiations to amend the SCBA one week prior to AAWW's announcement of its intention to acquire SAHI and its subsidiaries. They met for a second week of negotiations later in January 2016, a third week in February 2016, and two more weeks in March 2016.

24.     On January 19, 2016, the same day that AAWW publicly announced the SAHI

transaction, the IBTAD and Atlas/Polar reached tentative agreements on three contract sections,

including seniority and union representation.  On February 19, 2016, the IBTAD and Atlas/Polar

reached tentative agreements on two more sections, one covering grievance procedures and the

other covering arbitration.  The IBTAD and Atlas/Polar also exchanged proposals and negotiated

over several other articles during their January and February 2016 negotiation sessions, but did

not reach tentative agreements regarding them.

25.     At a meeting in Washington, DC that I attended on February 4, 2016 between

senior executives from AAWW and Atlas Air and Union representatives, the AAWW's Chief

Executive Officer informed the Union that AAWW desired to completely merge Southern's

airline operations with Atlas's while keeping Polar's separate.[1]

26.     In February 2016, Local 1224's President sent a letter to AAWW's Chief

Executive Officer.  In that letter, Local 1224 proposed that the parties enter into a letter of

agreement whereby the Southern pilots would, upon ratification by the affected pilots, migrate to

and be covered under the current Atlas/Polar labor agreement, subject to certain modifications

and contractual protections that would remain in place for an eighteen-month transition period.

Moreover, the Union proposed that the current Atlas/Polar labor agreement's December 31, 2016

amendable date would remain unchanged, and that the parties would continue their negotiations

to amend the agreement pursuant to Section 6 of the RLA. The Union proposed that the parties

agree not to seek mediation services from the NMB with respect to those negotiations until on or

---

[1] Additionally, in a letter sent to Local 1224 on April 13, 2016, Atlas's Chief Executive Officer,
who is also the Chief Executive Officer of AAWW, stated that it would operate Florida West
separately from the other three carriers.  (A true and correct copy of that letter is attached hereto
as Exhibit L.)

after January 2, 2017.  Furthermore, the Union proposed integrating the pilots' seniority lists effective on the ratification of the letter of agreement.  (A true and correct copy of that letter and its attached proposed letter of agreement is attached hereto as Exhibit M.)  Representatives from the Union and Atlas met in Washington, D.C., on or about February 14, 2016 to discuss the Union's proposal.  At that meeting, Atlas's Director of Flight Operations stated that management's objective was to avoid RLA Section 6 negotiations to amend the current Atlas/Polar labor agreement and to instead force the Union into a binding interest arbitration to merge the current Atlas/Polar and Southern labor agreements.  Shortly after the meeting, AAWW and Atlas rejected the Union's proposal.

27.     The IBTAD and Atlas/Polar continued their negotiations during the week of March 14, 2016.  On March 15, 2016, one day after the DOT had served its exemption *pendente lite* order, Atlas/Polar asserted to the IBTAD that in light of the DOT's order and AAWW's stated intention to completely merge Southern's operations with Atlas's, the IBTAD was required by the SCBA to stop negotiations for a stand-alone collective bargaining agreement and commence negotiations for a "merged" collective bargaining agreement.  Atlas/Polar further stated that, if needed, the IBTAD was also required to engage in binding interest arbitration, to effectuate the completion of the merged collective bargaining agreement. Atlas/Polar then provided the IBTAD with a proposed letter of agreement to govern that process, in which Atlas and Southern are collectively referenced as the "Airline Parties." (A true and correct copy of the March 15, 2016 proposed letter of agreement provided by Atlas/Polar, styled *"Transition Agreement,"* is attached hereto as Exhibit N.)  Among other things, the March 15, 2016 proposed Transition Agreement required the IBTAD to initiate an NMB representation proceeding by filing an application seeking recognition of a single transportation system and a single craft or

class of crewmembers (pilots).  Specifically, the proposed transition agreement provided that:

> The Airline Parties will support the Union's application to the National Mediation Board ("NMB") for recognition of a single transportation system and single crew member craft or class of the combined airline (the "Single Carrier"). **The Union will file for a Single Carrier when the Union determines that the facts support the legal requirements for the filing of a petition but in no event later than ninety (90) days after the date of signing of this Letter of Agreement. If and when the NMB makes a single carrier finding, the representative certified by the NMB shall be subject to this Letter of Agreement**.

(*Id.  Section III* (emphasis supplied).)

28.    At the March 15, 2016, negotiation session, when Atlas/Polar demanded that the IBTAD negotiate a merged collective bargaining agreement covering the Atlas/Polar and Southern pilots, Atlas/Polar ignored the fact that it was AAWW, a non-party to the SCBA, and not Atlas or Polar, that had acquired Southern as part of the acquisition of SAHI.  Atlas and Polar also ignored the fact that it was again AAWW, a non-party to the SCBA, and not Atlas or Polar, that had decided to completely merge Southern's operations only into Atlas and to continue to keep Polar's operations separate.  In so doing, Atlas/Polar did not provide any support for the purported right of AAWW - a non-party entity that had vigorously opposed and succeeded in avoiding SCBA party status as the "Company," or otherwise - to invoke the Atlas/Polar SCBA's contractual merger provisions.

29.    The IBTAD rejected the proposed transition agreement on March 17, 2016.  The Union did, however, offer Atlas/Polar an extension of the parties' current SCBA in order to facilitate negotiations for an SCBA covering the Atlas/Polar and Southern pilots.  (A true and correct copy of the Union's March 17, 2016 proposal is attached hereto as Exhibit O.)  In making its proposal, the Union expressly noted that it was not waiving its position that the parties were required to complete their negotiations for an amended, stand-alone SCBA covering the

Atlas/Polar pilots.  (*Ex. O.*)  Atlas/Polar summarily rejected the Union's proposal.

30.     Subsequently, during the second week of contract negotiations between Atlas/Polar and the Union in March 2016, Atlas/Polar provided the Union with counter-proposals to several contract proposals.  In so doing, Atlas/Polar insisted that its proposals were made in connection with negotiations for a joint, "merged" labor agreement pursuant, they claimed, to the requirements of the current Atlas/Polar and Southern contracts covering the pilots.  Specifically, Atlas/Polar's counter-proposals stated that:

> This proposal is made and provided in connection with negotiations for a joint collective bargaining agreement pursuant to Section 1.F.2.b.iii. of the Atlas/IBTAD CBA and Section 1.B.3. of the Southern Air, Inc./IBTAD CBA with the intent that its terms would apply to all IBTAD-represented crewmembers at both air carriers upon ratification.

(A true and correct copy of an excerpt from one such Atlas/Polar counter proposal is attached hereto as Exhibit P.) During that same bargaining session in late March 2016, the Union provided Atlas/Polar with revised proposals expressly rejecting the carriers' insistence that the parties were required to cease their ongoing negotiations for an amended SCBA.  In this regard, the IBTAD's revised proposals all stated:

> N.B. Union Rejects Company "JCBA" position and submits this Proposal in accordance with the parties' stand-alone, RLA Section 6 negotiations.

(A true and correct copy of an excerpt from one such IBTAD proposal is attached hereto as Exhibit Q.)

31.     On April 13, 2016, the IBTAD applied to the NMB for mediation with respect to its SCBA negotiations with Atlas/Polar pursuant to Sections 5 and 6 of the RLA.  (A true and correct copy of the IBTAD's April 13, 2016 mediation application is attached as Exhibit 21 to the April 20, 2017 Carlson Declaration.)  On the following day, April 14, 2016, Atlas filed a management grievance against the IBTAD, claiming that the IBTAD's invocation of NMB

mediation under the RLA was "in direct contravention of its obligations under Section 1.F.2.b.iii of the Atlas-IBTAD CBA." (A true and correct copy of that purported grievance is attached as Exhibit 5 to the April 20, 2017 Carlson Declaration.) Atlas claimed that the IBTAD was in violation of the "complete operational merger" provisions set forth in Section 1.F.2.b.iii of that agreement by refusing to negotiate with Atlas and Southern for a joint, "merged" labor agreement instead of negotiating to amend and improve the current Atlas/Polar and Southern contracts. Atlas further claimed that the IBTAD was in breach of the implied covenant of good faith and fair dealing by failing to provide Atlas and Southern with an integrated pilot seniority list. This claim is based on Atlas's false claim that Local 1224 had already substantially completed an integrated pilot seniority list. That claim is untrue and unsupported by any admissible evidence, and no representative from the Union has ever made that assertion.

32. The management grievance is flawed in a number or respects. For example, inasmuch as AAWW has expressed a desire and intent only to completely merge the airline operations of Atlas and Southern, neither AAWW nor, for that matter, Atlas, can compel the merger of the Southern pilots' contract into the Atlas/Polar contract when neither one intends to merge Polar's airline operations into those of Atlas and Southern. In a letter dated April 20, 2016, the IBTAD informed Atlas that the management grievance was "invalid and not arbitrable."

33. On April 15, 2016, Atlas requested that the NMB "decline to schedule mediation sessions" due to a "pending arbitration before the Atlas-IBTAD System Board of Adjustment." Atlas further claimed that that NMB mediation was "premature and unwarranted at this time." (A true and correct copy of that April 15, 2016, letter is attached as Exhibit 22 to the April 20, 2017 Carlson Declaration.) Nevertheless, on April 19, 2016, the NMB advised Atlas/Polar and

the IBTAD that the agency had "docketed" the IBTAD's application as Case No. A-13818, thereby asserting jurisdiction over the bargaining dispute. (A true and correct copy of that April 15, 2016, letter is attached as Exhibit 23 to the April 20, 2017 Carlson Declaration.) The NMB also assigned one of its mediators to "investigate the complexity of issues associated with this application prior to beginning any mediation sessions." (*April 20, 2017 Carlson Decl. Ex. 23.*) The NMB mediator subsequently conducted a joint meeting with Atlas/Polar and the Union in Detroit, Michigan, to gather information regarding the dispute. When asked by the IBTAD if the purpose of the meeting was to decide whether the NMB would or would not assert jurisdiction over the dispute, the NMB mediator answered that the NMB had already asserted jurisdiction over the dispute and that the purpose of the meeting was only to determine how best to proceed with mediation. Since that initial meeting, however, the NMB has not scheduled any mediation sessions, but has also not released the parties from its jurisdiction. Indeed, the NMB has repeatedly advised the IBTAD that it has asserted jurisdiction over the case.

### *Efforts to Resolve the Bargaining Dispute*

34.     At the request of AAWW's and Atlas/Polar's senior management, representatives from the Union met on May 10, 2016, in Washington D.C. I did not attend that meeting but understand that the management representatives informed Union representatives that management was willing to remove scope terms from the Section 1.F. arbitration process as long as the Union agreed to a three-year term for a merged contract. I also understand that the Union representatives agreed to consider management's suggestion and stated that they would respond at a later date.

35.     On July 14, 2016, the Union rejected Atlas's May 10, 2016 oral suggestion regarding merger negotiations and provided Atlas with a comprehensive proposal intended to

facilitate negotiations to reach a joint collective bargaining agreement ("JCBA") covering the Atlas, Polar and Southern pilots and operations. (A true and correct copy of the Union's July 14, 2016, proposal is attached as Exhibit 7 to the April 20, 2017 Carlson Declaration.) As set forth in the proposal, the Union offered that the parties would expressly reserve their respective rights and positions concerning the applicability of the merger provisions set forth in the current Atlas/Polar labor agreement. The Union also proposed that such "preservation of rights and positions by the Parties covers the management grievance filed on April 14, 2017 by Atlas against the Union[.]" (*April 20, 2017 Carlson Decl. Ex. 7, at 4.*) The Union further proposed that the parties agree to "suspend/toll/defer their dispute relating to the management grievance" but only "[w]hile this LOA remains in effect." (*Id.*) Moreover, the Union's July 14, 2016 proposal contained detailed expedited bargaining procedures that were intended to facilitate consensual agreement by the parties and avoidance of the need for interest arbitration, while ensuring that the parties could avail themselves of interest arbitration as a dispute resolution mechanism of last resort after they had exhausted all other agreed-upon methods to secure a consensual agreement on all terms. (*Id.*)

36.    Atlas/Polar rejected the Union's July 14, 2016 proposal in August 2016. Consequently, the Union's July 14, 2016 proposal never went into effect. On or about August 11, 2016, Atlas's John Dietrich told me that that he would soon be sending a letter to the Union, and asked that the Union use the letter as a basis by which to request a meeting that management very much wanted to have so that the parties could resume their negotiations for an amended contract. Dietrich subsequently sent a letter to Local 1224 on August 12, 2016 and, as Dietrich had requested, the Union responded to Dietrich's letter on September 2, 2016 advising that it was "ready, willing and able to meet with your colleagues in a further effort to resolve our dispute."

(True and correct copies of the August 12, 2016, and September 2, 2016, letters are attached as Exhibits 8 and 9 to the April 20, 2017 Carlson Declaration.) Dietrich then responded in a letter dated September 30, 2016. Dietrich stated in that letter, "This letter is in response to your September 2, 2016 communication to me regarding Atlas Air, Inc.'s ("Atlas" or "Company") most recent compromise proposal for the negotiations process between the Company and Local 1224 ("Union")." (A true and correct copy of Deitrich's September 30, 2016 letter is attached as Exhibit 10 to the April 20, 2017 Carlson Declaration.) Dietrich then expressed disappointment "that the Union declined to respond substantively to [Atlas/Polar's] August 12th compromise proposal," but was agreeable to meeting with the Union. Dietrich then confirmed that the meeting was scheduled for October 7, 2016, a date, he stated, that was "our first mutually available date."

37.     Representatives from the Union and management met in New York City in October 2016 to continue their discussions directed at finding a way to restart the collective bargaining negotiations, but they were unsuccessful. During these discussions, it became apparent that management's preferred approach was to set aside a 90-day period to negotiate scope terms for inclusion in a JCBA negotiated pursuant to Section 1.F. of the Atlas/Polar contract and Section 1.B. of the Southern contract. For instance, the Union's January 23, 2017 counter-proposal sought to confirm that the parties would reserve all of their rights regarding their dispute over the process by which they would complete their negotiations even if the parties reached agreement on scope terms during the proposed 90-day scope negotiations, and regardless of whether the agreed-upon scope terms were in a joint agreement or stand-alone agreements at the conclusion of their negotiations. In so doing, the Union sought to guard against any future claims by management that, by engaging in joint negotiations pursuant to a process or

framework agreement, the Union was waiving its position that the Atlas/Polar and Southern contracts did not apply to such negotiations. However, in a letter dated February 7, 2016, management rejected the Union's January 23, 2017 proposal. (A true and correct copy of that February 7, 2017 letter is attached as Exhibit 17 to the April 20, 2017 Carlson Declaration.) In so doing, management made clear that, notwithstanding the "reservation of rights" clause that the parties had proposed to one another during their discussions, management's position would be that if the Union agreed to management's joint negotiations framework proposal, the Union would indeed be binding itself to the Atlas/Polar merger negotiations process set forth in Section 1.F. of the Atlas/Polar contract. Thereafter, both sides exchanged additional proposals designed to restart the negotiations, but they were unable to reach agreement.

38.     Throughout all of the parties' discussions commencing in May 2016 through the date this action was filed, the Union never deviated from its position that Atlas's April 14, 2016 purported management grievance was invalid and not arbitrable.

I declare under penalty of perjury under the laws of the United States that the foregoing statements are true and correct.

Executed on:                                    Signed:

06/03/17