UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: March 13, 2018

------------------------------------------------------------X
ATLAS AIR, INC. and SOUTHERN AIR, INC., :
:
Plaintiffs, :
:
-v- :
:
INTERNATIONAL BROTHERHOOD OF :
TEAMSTERS, INTERNATIONAL :
BROTHERHOOD OF TEAMSTERS, AIRLINE :
DIVISION, and AIRLINE PROFESSIONALS :
ASSOCIATION OF THE INTERNATIONAL :
BROTHERHOOD OF TEAMSTERS, LOCAL :
UNION NO. 1224, :
:
Defendants. :
------------------------------------------------------------X

17-cv-903 (KBF)

OPINION & ORDER

KATHERINE B. FORREST, District Judge:

This action relates to the merger of two air carriers—Atlas Air, Inc. ("Atlas")

and Southern Air, Inc. ("Southern") (collectively, "plaintiffs"). On January 19, 2016,

Atlas' corporate parent, Atlas Air Worldwide Holdings, Inc. ("AAWH"), announced

plans to acquire Southern's corporate parent, Southern Air Holdings, Inc. ("SAHI").

Since that time, the parties to this action have been tangled in a protracted dispute

regarding the proper means of integrating Atlas's and Southern's respective

employees and operations. Plaintiffs assert that the applicable collective bargaining

agreements ("CBAs") require defendants[1] to negotiate a new joint collective

---

[1] International Brotherhood of Teamsters ("IBT") is the certified labor representative of both the
Atlas and Southern pilots. Airline Professionals Association of the International Brotherhood of
Teamsters, Local Union No. 1224 ("Local 1224") is the local collective bargaining agent designated by
IBT through International Brotherhood of Teamsters, Airline Division ("IBTAD") to represent both
the Atlas and Southern pilots. (Defs.' 56.1 Counterstatement ¶ 2.) For purposes of convenience, the
three defendant entities ("IBT," "Local 1224," and "IBTAD") are referred to collectively as
"defendants," "IBTAD," or the "Union" throughout this Opinion & Order.

bargaining agreement ("JCBA") that covers both companies' pilots.  Defendants

disagree, and would prefer to amend the standalone CBAs that existed before the

merger.  The sole question before the Court is whether the parties' dispute should

be resolved in arbitration.

Having carefully reviewed the parties respective submissions, the relevant

law, and the CBAs at issue, the Court concludes that this dispute is subject to

mandatory arbitration under the Railway Labor Act ("RLA"), 45 U.S.C. §§ 151 et

seq.  Accordingly, for the reasons stated below, plaintiffs' motion for summary

judgment and to compel arbitration at ECF No. 35 is GRANTED, and defendants'

motion for summary judgment[2] at ECF No. 41 is DENIED.

## I.    BACKGROUND

In order to fully understand the parties' respective positions, it is necessary

to understand some of the complicated history and corporate structure of the

involved air carriers.  The following recitation of facts is derived from the parties'

submissions under Local. Civ. R. 56.1 ("Rule 56.1") (ECF Nos. 37, 45)[3] and certain

documents filed in connection with the pending motions.  The facts are undisputed

unless otherwise noted.

---

[2] Defendants' dispositive motion was originally submitted as a motion to dismiss pursuant to Fed. R.
Civ. P. 12.  By Order dated February 23, 2018, the Court converted that motion to a motion for
summary judgment pursuant to Fed. R. Civ. P. 56.  (ECF No. 60.)

[3] Defendants' Rule 56.1 Counterstatement at ECF No. 45 contains a number of additional factual
assertions concerning, inter alia, the history of labor negotiations between the parties to this action.
(See Defs.' 56.1 Counterstatement, ECF No. 45.)  By letter dated March 1, 2018, plaintiffs indicated
that they "do not dispute the additional facts included by Defendants in their Rule 56.1 statement"
for purposes of the pending motions.  (ECF No. 61.)

A.    The Air Carriers

1.    Atlas

Atlas Air, Inc. ("Atlas") is a wholly owned subsidiary of Atlas Air Worldwide

Holdings, Inc. ("AAWH").  In 2001, AAWH acquired another air carrier, Polar Air

Cargo, Inc. ("Polar").[4]  Following that acquisition, both Atlas and Polar continued to

maintain separate operations and separate United States Department of

Transportation ("DOT") operating certificates.  Furthermore, although Atlas's and

Polar's pilots were represented by the same union—Air Line Pilots Association,

AFL-CIO ("ALPA")—they remained subject to distinct, preexisting collective

bargaining agreements ("CBAs") with their respective companies.

In June 2005, AAWH decided to merge Atlas's and Polar's business

operations under a single DOT air certificate while continuing to maintain separate

public-facing brands.  The Polar pilots objected to a full operational merger, and

eventually went on strike (the Atlas pilots, on the other hand, did not object).  The

Polar strike eventually ended, and in March 2006 the Atlas and Polar pilots

commenced negotiations to integrate their respective seniority lists pursuant to

ALPA's merger procedures.  The parties were unable to reach an agreement, and

ultimately submitted their dispute to an arbitrator.  On November 24, 2006,

---

[4] In 2005, AAWH sold a portion of Polar's business operations to DHL Network Operations, Inc.
("DHL").  In connection with that transaction, a retained portion of Polar's operations and employees
were administratively transferred to a separate AAWH subsidiary called Polar Air Cargo Worldwide,
Inc. ("PACW").  After the DHL transaction was completed in June 2007, PACW continued operations
using the original "Polar Air Cargo" name.  Despite this internal reshuffling, for purposes of
convenience the Court will refer to the legacy Polar Air Cargo, Inc. entity as "Polar" throughout this
Opinion & Order.

Arbitrator Robert O. Harris issued an award integrating the two pilot groups' seniority lists.

While the Atlas and Polar pilots were negotiating the integration of their respective seniority lists, AAWH reversed its prior decision to fully merge the two companies' operations. Instead, Atlas and Polar sought to commence negotiations on a new "single collective bargaining agreement" ("SCBA") that would cover both companies' pilots. ALPA initially resisted, and as a result both Atlas and Polar filed management grievances under their respective CBAs. The Atlas pilots ultimately conceded that they were obligated to negotiate, but the Polar pilots continued to resist.[5]

On May 9, 2008, the ALPA Executive Council directed ALPA's president to present the combined seniority list to Atlas and Polar and to commence negotiations for a SCBA. ALPA presented the combined list on May 23, 2008, thereby triggering a nine-month negotiation window after which open issues were subject to final and binding arbitration. On September 29, 2008, in the middle of that negotiation window, the National Mediation Board ("NMB") decided that Atlas and Polar constituted a "single carrier" for labor representation purposes. Subsequently, on December 22, 2008, the International Brotherhood of Teamsters, Airline Division

---

[5] Polar filed an action in the United States District Court for the Southern District of New York ("S.D.N.Y.") seeking to compel arbitration on the question of whether the Polar pilots had to negotiate a SCBA. See PACW v. ALPA, et al., Case No. 07-cv-7327 (S.D.N.Y. Aug 16, 2007). After a preliminary order directing the parties to arbitrate two narrow issues (but reserving judgment on the merits), the case was voluntarily dismissed without prejudice on July 31, 2009. (See id. at ECF No. 10.)

("IBTAD") replaced ALPA as the certified labor representative of both the Atlas and Polar pilots.

In February 2009, Atlas, Polar, and IBTAD executed a "Negotiation Framework for Merged Collective Bargaining Agreement" (the "Framework Agreement"), which established a procedure for SCBA negotiations. (Decl. of Robert Kirchner Ex. F ("Framework Agreement"), ECF No. 42-2.) It specified that if the parties were unable to execute a SCBA by August 13, 2009, "all outstanding issues shall be submitted to binding interest arbitration." (Id. § C.1 at 3.) Notably, AAWH was not party to the Framework Agreement.

The parties were unable to agree on terms for a SCBA, and consequently submitted their dispute to interest arbitration in late 2010. During those proceedings, IBTAD argued that AAWH should be included as a "Related Entity" subject to the scope provisions of the SCBA. (Decl. of Jeffrey D. Carlson ("Carlson Decl.") Ex. 30 ("Arbitration Award") at 8-9, ECF No. 38-30.) Atlas and Polar, on the other hand, argued that AAWH should not be bound by the SCBA because it was not signatory to the underlying CBAs. (Id. at 18-19.) Ultimately, Interest Arbitrator Richard R. Kasher sided with Atlas and Polar, and as a result AAWH was not included as a "Related Entity" subject to the SCBA's scope provisions. (Id. at 32.) The resulting SCBA (hereinafter, the "Atlas CBA") became effective on September 8, 2011 and became amendable five years later on September 8, 2016.

2.      Southern

Southern Air, Inc. ("Southern") is a direct subsidiary of Southern Air

Holdings, Inc. ("SAHI").  Like Atlas and Polar, Southern is a contract air carrier

that, inter alia, provides express cargo operations for DHL.  In 2010, the Southern

pilots' existing labor association merged with IBTAD.  The NMB subsequently

certified IBTAD as the Southern pilots' labor representative on February 24, 2010.

The Southern pilots are currently subject to a CBA (the "Southern CBA") that

became effective on November 6, 2012 and became amendable four years later on

November 6, 2016.

B.      The Applicable Collective Bargaining Agreements

1.      The Atlas CBA

The Atlas CBA contains a provision regarding certain "Labor Protections"

that apply, inter alia, "in the event the Company decides there will be a complete

operational merger between the Company and an affiliated air carrier[.]"  (Carlson

Decl. Ex. 4 ("Atlas CBA") § 1.F.2, ECF No. 38-4.)[6]  The Atlas CBA further provides

that:

> [i]f the crewmembers of the acquired carrier are represented by the Union,
> then the parties shall on a timely basis begin negotiations to merge the two
> pre-integration collective bargaining agreements into one agreement.  If a
> merged agreement has not been executed within nine (9) months from the
> date that the Union presents to the Company a merged seniority list . . . the
> parties shall jointly submit the outstanding issues to binding interest
> arbitration.

---

[6] The relevant provisions of the Atlas CBA are contained in two separate exhibits (Exs. 1 and 4) to
the Declaration of Jeffrey D. Carlson, which can be found at ECF Nos. 38-1 and 38-4.  For purposes
of convenience, the Court will refer to those provisions collectively as "Atlas CBA."

(Atlas CBA § 1.F.2.b.iii.)  The Atlas CBA defines "Company" as referring to "Atlas Air, Inc. and Polar Air Cargo Worldwide, Inc."  (Atlas CBA § 1.A.)

The Atlas CBA also includes a provision creating a System Board of Adjustment (the "Atlas Adjustment Board") to resolve certain grievances regarding interpretation and application of the Atlas CBA.  (Atlas CBA § 21.)  As relevant here, that provision provides that the Atlas Adjustment Board:

> shall have jurisdiction over all disputes between a Crewmember and the Company, or between the Company and the Union, growing out of the interpretation or application of any of the terms of this Agreement [the Atlas CBA] or amendments thereto.

(Id. at § 21.B.1.)

2.     The Southern CBA

The Southern CBA contains a provision stating that "[i]n the event of a merger, this Agreement shall be merged with the merging air carrier's crewmember collective bargaining agreement, if any[.]"  (Carlson Decl. Ex. 18 ("Southern CBA") § 1.B.3, ECF No. 38-18.) [7]  The Southern CBA further provides that:

> if such merged agreement is not completed within nine (9) months from the date an integrated Master Seniority List is submitted to the surviving entity, the parties shall submit all outstanding issues to binding interest arbitration.

(Id.)

Like the Atlas CBA, the Southern CBA also includes a provision creating a System Board of Adjustment (the "Southern Adjustment Board") to resolve certain grievances regarding the interpretation and application of the Southern CBA.

_____

[7] The relevant provisions of the Southern CBA are contained in two separate exhibits (Exs. 2 and 18) to the Declaration of Jeffrey D. Carlson, which can be found at ECF Nos. 38-2 and 38-18.  For purposes of convenience, the Court will refer to those provisions collectively as "Southern CBA."

(Southern CBA § 19.D.)  As relevant here, that provision provides that the Southern

Adjustment Board:

> shall have jurisdiction over disputes growing out of grievances or out of the interpretation or application of any of the terms of this Agreement.  The jurisdiction of the Board shall not extend to proposed changes in hours of employment, rates of compensation, or working conditions.

(Southern CBA § 19.D.2.)

### C.    The Merger and Resulting Dispute

As previously noted, AAWH announced plans to acquire SAHI and its

subsidiary airlines (including Southern) on January 19, 2016.  The acquisition was

completed on April 7, 2016, at which point Southern became a subsidiary of AAWH.

Following its announcement of the planned acquisition, AAWH announced

plans to "merge the Atlas and Southern airlines and pilots."  (Carlson Decl. Ex. 3 at

3, ECF No. 38-3.)  AAWH has taken the position that the Atlas and Southern pilot

groups are required to negotiate a "joint collective bargaining agreement" ("JCBA")

pursuant to the terms of their respective CBAs.  As discussed more fully infra, the

Atlas and Southern pilots disagree[8] and thus far have refused to commence

negotiations as requested.

### D.    Management Grievances and Pre-Litigation Discussions

#### 1.    Atlas

On April 14, 2016, Atlas filed a management grievance with the Atlas

Adjustment Board.  The issue for resolution in that grievance is whether the Atlas

---

[8] The Atlas and Southern pilots have instead requested to engage in "stand-alone collective bargaining negotiations pursuant to RLA sections 5 and 6, 45 U.S.C. §§ 155-56."  (Defs.' 56.1 Counterstatement ¶ 12.)

pilots are "violating Section 1.F.2.b.iii of the [Atlas CBA] by refusing to engage in negotiations for a [JCBA] pursuant to the terms and conditions set forth therein in light of the announced operational merger of Atlas and [Southern]." (Carlson Decl. Ex. 5 ("Atlas Management Grievance") at 2, ECF No. 38-5.) Atlas further requested expedited arbitration pursuant to § 1.H of the Atlas CBA. (Id. at 8.)

On April 20, 2016, the Union sent a letter to Atlas stating, in relevant part, that "the purported management grievance is intricately related to, and indeed dependent upon, the resolution of RLA statutory issues underlying our dispute" and therefore is "invalid and not arbitrable." (Carlson Decl. Ex. 6 at 3, ECF No. 38-6.) Nonetheless, the Union indicated that it "look[ed] forward to an amicable resolution of our dispute through consensual negotiations." (Id.)

On May 10, 2016, representatives from the Union and Atlas met to discuss, in sum and substance, their collective bargaining dispute. During that meeting, Atlas made a "compromise proposal" to remove the disputed scope terms from the interest arbitration. The Union rejected that proposal by e-mail dated July 14, 2016, and included a counter-proposal (the "LOA") for JCBA negotiations. (Carlson Decl. Ex. 7, ECF No. 38-7.) The Union's proposal included an agreement to "suspend/toll/defer [the] dispute relating to the management grievance" "[w]hile this LOA remains in effect." (Id. at 5 of 17.)

The parties continued negotiations regarding merger and/or amendment of the Atlas CBA throughout 2016 and into early 2017. During that time, the parties exchanged multiple draft compromise proposals that would have resulted in JCBA

negotiations.  Ultimately, however, the parties were unable to reach an agreement, and in February 2017 negotiations effectively ended.

### 2. Southern

On January 24, 2017, Southern filed a management grievance with the Southern Adjustment Board.  The issue for resolution in that grievance is whether Southern pilots are "violating Section 1.B.3 of the [Southern CBA] by refusing to engage in negotiations for a [JCBA] pursuant to the terms and conditions set forth therein in light of the merger of [Atlas] and [Southern]?"  (Carlson Decl. Ex. 19 ("Southern Management Grievance") at 1, ECF No. 38-19.)  Southern further requested expedited arbitration of that grievance.  (Id. at 3.)

On February 8, 2017, the Union sent a letter to Southern stating, in relevant part, that "the purported management grievance is intricately related to, and indeed dependent upon, the resolution of RLA statutory issues underlying our dispute" and therefore is "invalid and nonarbitrable."  (Carlson Decl. Ex. 20, ECF No. 38-20.)  Nonetheless, IBTAD indicated that it "look[ed] forward to an amicable resolution of our dispute through consensual negotiations."  (Id.)

### E. NMB Proceedings

### 1. Atlas

On April 13, 2016, the Union filed an Application for Mediation Services (the "Atlas NMB Application") with the NMB.  (See Carlson Decl. Ex. 21 ("Atlas NMB Application"), ECF No. 38-21.)  The Union requested "NMB mediation services to assist in the negotiation of an amended collective bargaining agreement between

[Atlas] and [IBTAD]" pursuant to § 5 of the RLA. (Id. at 2 of 5.) Atlas opposed that application on April 15, 2016, arguing in sum that § 1.F.2.b.iii of the Atlas CBA required the Union to negotiate for a JCBA, and that the Union's decision to file the Atlas NMB Application constituted a breach of same. (Carlson Decl. Ex. 22 at 3-4, ECF No. 38-22.) Atlas accordingly requested that NMB "decline to schedule mediation sessions" pending resolution of Atlas's management grievance. (Id. at 4.)

On April 19, 2016, NMB docketed the Atlas NMB Application.[9] Subsequently, on May 31, 2016, the NMB-assigned Mediator, James Mackenzie, informed the parties that he would hold a "Fact Finding Meeting" on June 23, 2016. (Carlson Decl. Ex. 24, ECF No. 38-24.) At that meeting, Atlas reiterated its position that NMB should decline to conduct mediation until the Atlas Management Grievance was resolved. The parties have not met with NMB since that date.

2.    Southern

On January 10, 2017, the Union filed an Application for Mediation Services (the "Southern NMB Application") with the NMB. (See Carlson Decl. Ex. 27, ECF No. 38-27.) On January 11, 2017, NMB docketed the Southern NMB Application. Similar to the situation with Atlas described above, Southern opposed that application on January 24, 2017, arguing that § 1.B.3 of the Southern CBA required the Union to negotiate for a JCBA. (Carlson Decl. Ex. 29 at 1-2, ECF No. 38-29.) Southern accordingly requested that NMB "decline to schedule mediation sessions"

---

[9] The parties dispute whether NMB's decision to formally "docket" the Atlas and Southern NMB Applications constituted an assertion of jurisdiction. For the reasons stated infra, the Court need not resolve that dispute.

pending resolution of the parties' dispute regarding interpretation of the Southern CBA. (Id. at 5.)

F.  Litigation History

Plaintiffs commenced the present action on February 7, 2017, seeking to compel arbitration of the above-referenced management grievances regarding interpretation and application of the Atlas and Southern CBAs. (See generally Compl., ECF No. 1.) Currently before the Court are the parties' dueling motions for summary judgment. (ECF Nos. 35, 41.)

Plaintiffs argue, in sum, that the disputes regarding interpretation and/or application of the underlying Atlas and Southern CBAs are "minor disputes" under the RLA, and therefore subject to mandatory arbitration by the applicable adjustment boards. (See generally Pls.' Mem. of Law, ECF No. 36.) In response, defendants argue that: (1) this Court lacks subject-matter jurisdiction due to ongoing NMB proceedings; (2) plaintiffs' complaint is untimely; and (3) in any event, the disputes are not arbitrable under the relevant CBAs. (See generally Defs.' Mem. of Law, ECF No. 46.)

II.  LEGAL PRINCIPLES

A.  Summary Judgment Standard

Summary judgment may be granted when a movant shows, based on admissible evidence in the record, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating "the absence of

a genuine issue of material fact." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). In reviewing a motion for summary judgment, the Court construes all evidence in the light most favorable to the nonmoving party, and draws all inferences and resolves all ambiguities in its favor. <u>Dickerson v. Napolitano</u>, 604 F.3d 732, 740 (2d Cir. 2010). The Court's role is to determine whether there are any triable issues of material fact, not to weigh the evidence or resolve any factual disputes. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248-49 (1986).

B.  <u>The Railway Labor Act</u>

The Railway Labor Act ("RLA" or the "Act"), 45 U.S.C. §§ 151 <u>et seq.</u>, governs labor relations in the railroad and airline industries. Multiple provisions of the RLA are relevant to the Court's resolution of this action.

1.  Major and Minor Disputes

As the Supreme Court has noted, "Congress' purpose in passing the RLA was to promote stability in labor-management relations by providing a comprehensive framework for resolving labor disputes." <u>Hawaiian Airlines, Inc. v. Norris</u>, 512 U.S. 246, 252 (1994) (citations omitted); <u>see also</u> 45 U.S.C. § 151a. To accomplish that purpose, the RLA divides most labor disputes in two categories—"major" and "minor"—and establishes distinct resolution mechanisms for each.

Major disputes are those "concerning rates of pay, rules, or working conditions." <u>See</u> 45 U.S.C. § 151a. The Supreme Court has clarified that major disputes "seek to <u>create</u> contractual rights," <u>Consol. Rail Corp. v. Ry. Labor Executives' Ass'n ("Conrail")</u>, 491 U.S. 299, 302 (1989) (emphasis added) (citation

omitted), and "arise where there is no [CBA] or where it is sought to change the terms of one, and therefore the issue is not whether an existing agreement controls the controversy," <u>Elgin, J. & E. Ry. Co. v. Burley</u>, 325 U.S. 711, 723 (1945). In other words, major disputes relate to "the formation of collective [bargaining] agreements or efforts to secure them." <u>Conrail</u>, 491 U.S. at 302 (quoting <u>Burley</u>, 325 U.S. at 723). Although the RLA requires parties to "undergo a lengthy process of bargaining and mediation"[10] in the event of a major dispute, federal district courts do have limited jurisdiction, <u>e.g.</u> "to enjoin a violation of the status quo pending completion of the required procedures." <u>Id.</u> at 302-03.

Minor disputes, on the other hand, "grow[] out of grievances or out of the interpretation or application of agreements covering rates of pay, rules, or working conditions." <u>See</u> 45 U.S.C. § 151a; <u>see also</u> <u>Lindsay v. Ass'n of Prof'l Flights Attendants</u>, 581 F.3d 47, 51 (2d Cir. 2009). Accordingly, minor disputes "seek . . . to enforce" <u>existing</u> contractual rights, not to create new ones. <u>Conrail</u>, 491 U.S. at 302 (citing <u>Burley</u>, 325 U.S. at 723). Minor disputes "contemplate[] the existence of a collective agreement already concluded," and "relate[] either to the meaning or proper application of a particular provision with reference to a specific situation or to an omitted case." <u>Burley</u>, 325 U.S. at 723; <u>see also</u> <u>Hawaiian Airlines</u>, 512 U.S. at 253 ("Minor disputes involve 'controversies over the meaning of an existing collective bargaining agreement in a particular fact situation.'" (quoting <u>Brotherhood of R.R. Trainmen v. Chicago R. & I.R. Co.</u>, 353 U.S. 30, 33 (1957));

---

[10] As defendants correctly note, major disputes are subject to "mediation under the auspices of the National Mediation Board." <u>Burley</u>, 325 U.S. at 725; <u>see also</u> 45 U.S.C. §§ 155-56.

<u>Ass'n of Flight Attendants, AFL-CIO v. United Airlines, Inc.</u>, 976 F.2d 102, 104 (2d Cir. 1992) (holding that minor disputes involve "legitimate disagreement over an ambiguity in a collective agreement").

Unlike major disputes, minor disputes are subject to "compulsory and binding" arbitration before the appropriate adjustment board. <u>Conrail</u>, 491 U.S. at 303-04; <u>see also</u> <u>Bhd. of Locomotive Engineers v. Louisville & N. R. Co.</u>, 373 U.S. 33, 38 (1963) (holding that the RLA "grievance procedure is a mandatory, exclusive, and comprehensive system for resolving grievance disputes"). The adjustment board's jurisdiction is exclusive, <u>Conrail</u>, 491 U.S. at 304, and district courts may only review or set aside the binding decision of the adjustment board in limited circumstances, <u>see</u> <u>Union Pacific R. Co. v. Sheehan</u>, 439 U.S. 89, 93 (1978); <u>see also</u> 45 U.S.C. § 153(q).[11] To facilitate this statutory scheme, a federal court may compel arbitration of a minor dispute. <u>See</u> <u>W. Airlines, Inc. v. Int'l Bhd. of Teamsters</u>, 480 U.S. 1301, 1302 (1987) ("While courts lack authority to interpret the terms of a collective-bargaining agreement, a court may compel arbitration of a minor dispute before the authorized System Board.").

The party asserting that a labor dispute is minor bears the "relatively light burden" of establishing arbitral jurisdiction under the RLA. <u>Conrail</u>, 491 U.S. at 305-07 (quotation and citation omitted). To satisfy that burden, the party must demonstrate that "the action is arguably justified by the terms of the parties' [CBA]" and not "frivolous or obviously insubstantial." <u>Id.</u> at 307.

---

[11] Federal district courts may also enjoin strikes arising out of minor disputes. <u>See</u> <u>Conrail</u>, 491 U.S. at 304.

2. Representation Disputes

Distinct from major and minor disputes are so-called "representation" disputes. Representation disputes "involve controversies surrounding the designation and authorization of representatives of employees covered under the RLA," and are "committed to the exclusive jurisdiction of the NMB." <u>Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.</u>, 956 F.2d 1245, 1250 (2d Cir. 1992) (quoting <u>Air Line Pilots Ass'n v. Texas Int'l Airlines</u>, 656 F.2d 16, 20 n. 6 (2d Cir. 1981) (citations omitted); <u>see also</u> 45 U.S.C. § 152, Ninth. The Second Circuit has held that federal jurisdiction to review an NMB representation decision is "extremely limited," and "confined to 'instances of constitutional dimension or gross violation of the statute.'" <u>Id.</u> (quoting <u>British Airways Board v. Nat'l Mediation Bd.</u>, 685 F.2d 52, 55 (2d Cir.1982)).

III. DISCUSSION

Although the facts underlying this action are complicated, the Court's resolution is not. It is absolutely clear that the present dispute—<u>i.e.</u>, whether defendants must negotiate for a new JCBA pursuant to the terms of their respective CBAs—is a minor dispute under the RLA, and is therefore subject to mandatory arbitration by the appropriate adjustment boards. <u>See</u> 45 U.S.C. § 153.

First, it is undisputed that the Atlas and Southern pilots are subject to the Atlas and Southern CBAs, respectively. As such, the issue here is whether those <u>pre-existing</u> CBAs require defendants to negotiate a JCBA, not (1) whether defendants must negotiate a CBA in the first instance, or (2) what the terms of the

new CBA/JCBA should be.  And as the text of the RLA makes abundantly clear (and the Supreme Court has repeatedly confirmed), minor disputes grow out of the "interpretation or application" of existing CBAs.  See 45 U.S.C. § 151a; see also, e.g., Burley, 325 U.S. at 723.

Here, plaintiffs' reading of the relevant CBA provisions is "arguably justified."  Conrail, 491 U.S. at 306-07.  Section 1.F.2.b.iii of the Atlas CBA provides that when crewmembers of the merging airlines are represented by the same union, "the parties shall on a timely basis begin negotiations to merge the two pre-integration [CBAs] into one agreement." (Atlas CBA § 1.F.2.b.iii.)  Similarly, § 1.B.3 of the Southern CBA provides that "[i]n the event of a merger, this Agreement shall be merged with the merging air carrier's crewmember collective bargaining agreement, if any[.]"  (Southern CBA § 1.B.3.)  Plaintiffs' position that those contractual provisions require the Union to negotiate a JCBA (rather than amending the standalone CBAs) is not "frivolous or obviously insubstantial," and therefore this dispute is properly categorized as "minor" under the RLA.[12]

The only confounding factor here is that the minor dispute relates to a contractual provision that provides for negotiation of a JCBA.  At first glance, that may appear to constitute a major dispute since it relates, albeit indirectly, to "the formation of [a] collective bargaining agreement."  Conrail, 491 U.S. at 302 (emphasis added).  But the actual terms of the JCBA are not at issue here, and

---

[12] The Court takes no position as to whether plaintiffs' reading of the CBAs is actually correct as a matter of law, or that plaintiffs should prevail in the ensuing arbitration proceedings.  Resolution of those questions must and shall be left to the appropriate adjustment board.

neither Atlas nor Southern is seeking to unilaterally change the provisions of an existing CBA; the sole issue is whether defendants are required to negotiate for a JCBA or whether they can insist upon amending the terms of their existing standalone CBAs. The answer to that question inexorably turns on "interpretation or application" of the existing Atlas and Southern CBAs (§§1.F.2.b.iii and 1.B.3, respectively), and therefore constitutes a minor dispute subject to mandatory arbitration under the RLA.[13]

The Court understands that this is a significant point of contention between the parties, but "the formal demarcation between major and minor disputes does not turn on a case-by-case determination of the importance of the issue presented or the likelihood that it would prompt the exercise of economic self-help." Conrail, 491 U.S. at 305; see also Burley, 325 U.S. at 724 (noting that minor disputes "seldom produce strikes, though in exaggerated instances they may do so.") Instead, the "distinguishing feature" of a minor dispute is "that the dispute may be conclusively resolved by interpreting the existing agreement." Conrail, 491 U.S. at 305 (citation omitted).

Defendants have argued, in sum, that (1) the NMB has asserted exclusive jurisdiction over this action, thereby depriving this Court of subject-matter jurisdiction; (2) plaintiffs' motion to compel arbitration is time-barred; and (3) the

---

[13] If defendants had agreed to negotiate a new JCBA and this action related to a breakdown of those substantive negotiations, the analysis may be different. The Court takes no position on whether such a dispute would be considered "major" or "minor" under the RLA. Here, the parties dispute the threshold issue of whether defendants must negotiate a new JCBA. To the Court's knowledge, no substantive negotiations on a JCBA have taken place.

specific issues here are not arbitrable by the relevant adjustment boards.  (<u>See</u>
<u>generally</u> Defs.' Mem. of Law, ECF No. 46.)  All three arguments are unavailing.

First, it makes absolutely no difference whether the NMB has "asserted
jurisdiction," only whether the NMB has <u>properly</u> asserted jurisdiction.[14]  The RLA
makes clear that the NMB's exclusive jurisdiction is limited to major disputes and
representation disputes.  As described above, this action does not concern a major
dispute under the RLA.  Further, since both pilots' groups are represented by the
same union[15], there is no need for the NMB to determine which union should
represent the Atlas and Southern pilots in interest arbitration <u>or</u> JCBA negotiations
under 45 U.S.C. § 152, Ninth.  And even if the NMB is called upon at some point to
determine whether the carriers constitute a single transportation system (<u>i.e.</u>, a
"single carrier"), nothing about the present dispute "interferes legally or practically
with the [NMB's] capacity, <u>at any time</u>" to make that determination.  <u>See</u> <u>Ass'n of</u>
<u>Flight Attendants, AFL-CIO v. United Airlines, Inc.</u>, 71 F.3d 915, 919 (D.C. Cir.
1995).  The RLA makes clear that minor disputes should be resolved by the
appropriate adjustment board(s), and this Court has jurisdiction to compel
arbitration in accordance therewith.

---

[14] The Court notes that defendants' argument that NMB has "asserted jurisdiction" by docketing the applications is tenuous at best.  Courts routinely "docket" cases as an administrative matter before determining whether they have jurisdiction or not.  In fact, it would be impossible for a court to issue a decision regarding jurisdiction <u>without</u> docketing the case.  The mere fact that NMB has docketed the relevant applications, therefore, is not indicative of NMB's view over whether the present action falls within its exclusive jurisdiction.
[15] It is undisputed that Local 1224 is the local collective bargaining agent designated by the IBTAD to represent both the Atlas and Southern Pilots.  (Defs.' 56.1 Counterstatement ¶ 2.)  Defendants argue that the Atlas and Southern pilots are represented by separate bargaining units (presumably within Local 1224), but even if true that makes no difference to the Court's holding here.

Second, plaintiffs' motion to compel arbitration is not time-barred.[16]  It is true that generally, a party must move to compel arbitration within six months from the date "a party unequivocally refuses a demand to arbitrate."  C.f. Assoc. Brick Mason Contractors, Inc. v. Harrington, 820 F.2d 31, 37 (2d Cir. 1987).  Defendants argue that they unequivocally refused plaintiffs' arbitration demand on April 20, 2016, when the Union told Atlas that its grievance was "invalid and not arbitrable."  But defendants' own proffered evidence proves the opposite.  As an initial matter, it is undisputed that the Union "participated in several meetings to discuss a solution that would enable the parties to resume their collective bargaining negotiations" subsequent to April 20, 2016.  (Defs.' Mem. of Law at 32-33.)  And on July 14, 2016, the Union made a counter-proposal that provided for JCBA negotiations and agreed to "suspend/toll/defer the[] dispute relating to the management grievance" while the LOA remained in effect.  (Carlson Decl. Ex. 7, ECF No. 38-7.)

Defendants argue that the LOA was never executed, and therefore defendants never deviated from their prior refusal to arbitrate.  But that argument is beside the point—irrespective whether the LOA was executed, it is clear that the Union was actively negotiating the merits of the Atlas grievance (i.e., means of negotiating of a JCBA) through January 2017.  It would have been nonsensical for Atlas, in the midst of those live negotiations, to file an action in federal court

---

[16] The Court notes that defendants' brief could be construed to argue that the action is time barred with respect to Atlas and Southern.  (Defs.' Mem. of Law at 33-34 ("Plaintiffs were on notice no later than April 20, 2016 that the IBTAD had refused to arbitrate the issue of whether the IBTAD-Atlas/Polar and IBTAD-Southern contracts compelled it to negotiate a [JCBA].").)  However, since the Southern Management Grievance was not filed until January 24, 2017, and this action was commenced on February 7, 2017, this action is unquestionably timely as to the Southern Management Grievance.

seeking to compel arbitration.  In fact, such action may have violated the RLA, which requires parties to "exert every reasonable effort to make and maintain [CBAs], and to settle all disputes . . . in order to avoid any interruption to commerce or to the operation of any carrier[.]"  45 U.S.C. § 152, First.  Because the Union continued to negotiate the merits of the Atlas Management Grievance into early 2017, plaintiffs' cause of action did not accrue until negotiations ended and therefore this action is timely.

Finally, it is clear that the disputes here are arbitrable.  The Atlas and Southern adjustment boards will be called upon to interpret distinct provisions of the Atlas and Southern CBAs, respectively.[17]  Defendants' arguments regarding whether those provisions actually require JCBA negotiations in this instance go to the merits of the management grievance, and should be decided by the appropriate adjustment boards in the first instance.  To adopt any of defendants' arguments in this regard—e.g. that AAWH is not the "Company" for purposes of the Atlas CBA— the Court would have to interpret the underlying CBAs.  The RLA makes clear that issues of interpretation and application are to be resolved by the relevant adjustment board, and therefore defendants' arguments must be reserved for arbitration.

---

[17] Defendants' argument that the Southern Adjustment Board lacks jurisdiction to consider this dispute is plainly incorrect.  The Southern CBA provides that the Southern Adjustment Board's jurisdiction "shall not extend to proposed changes in hours of employment, rates of compensation, or working conditions."  (Southern CBA § 19.D.2.)  But as previously noted, the actual terms of the JCBA are not at issue here—the sole issue is whether the Union must negotiate.  That issue turns on interpretation of § 1.B.3 of the Southern CBA, and the Southern Adjustment Board unquestionably has jurisdiction "over disputes growing out of . . . the interpretation or application of any of the terms" of the Southern CBA.  (Id.)

IV.    CONCLUSION

For the reasons stated above, the Court GRANTS plaintiffs' motion for summary judgment and to compel arbitration at ECF No. 35 and DENIES defendants' motion for summary judgment at ECF No. 41.

The Clerk of Court is directed to terminate all open motions and terminate this action.

SO ORDERED.

Dated:    New York, New York
          March 13, 2018

_____
KATHERINE B. FORREST
United States District Judge